COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges O'Brien, Causey and Frucci

E.G. MIDDLETON, INC., ET AL.

MEMORANDUM OPINION[*]

v.      Record No. 1659-24-1                    PER CURIAM
                                                OCTOBER 28, 2025

ROBERT SPRY

FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

(Brian J. McNamara; Audrey M. Marcello; Ford Richardson, PC, on
briefs), for appellants.

(Stephen A. Strickler; Matthew H. Kraft; Inman & Strickler, P.L.C.;
Matthew H. Kraft, P.L.C., on brief), for appellee.

E.G. Middleton, Inc., the Commonwealth Contractors Group Self-Insurance Association,

and Landin Services LLC (collectively, Middleton) appeal a Workers' Compensation

Commission's award of temporary total disability and medical benefits to Robert Spry.

Middleton contends that the Commission erred by finding that Spry suffered a compensable neck

injury on December 16, 2019, and by finding that the injury later caused him to suffer a spinal

infarction.[1] Finding no error, we affirm.

BACKGROUND

"This Court considers the evidence in the light most favorable to the prevailing party," in

this case, Spry. *Smith-Adams v. Fairfax Cnty. Sch. Bd.*, 67 Va. App. 584, 590 (2017). Middleton

employed Spry as a journeyman electrician. On December 15, 2019, Spry and his apprentice

_____

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Having examined the briefs and record in this case, the panel unanimously agrees that
oral argument is unnecessary because "the appeal is wholly without merit." *See* Code
§ 17.1-403(ii)(a); Rule 5A:27(a).

installed several electrical control boxes above a 12-foot tall ceiling in a room that was 40 feet long and 15 feet wide. Spry returned to the room the next day to verify that the control boxes had been "wired up," and he inspected them through the room's ceiling grid. Spry could not place a ladder underneath the ceiling grid because tools and drywall were in the way. Instead, he stood "almost directly below" one of the control boxes and "crane[d]" his head "pretty straight up." Spry's neck "popped" while inspecting the control box in that position, causing pain in his left arm and shoulder and preventing him from turning his head to the left.

Spry sought medical attention after his neck popped, and he was diagnosed with torticollis. He returned to full-duty work but continued to suffer from a "multitude of problems," such as neck and shoulder pain, and he had his apprentice "do most of the work." On January 13, 2020, Spry left work early because he felt sick and had vomited. He could not move his arms or turn his head the following morning and was later diagnosed as having suffered a spinal infarction.[2] According to Spry, he cannot lift more than ten pounds, cannot feel his hands or turn his head, is forgetful, has daily headaches, and suffers from neck and shoulder pain.

Spry filed a claim for benefits with the Commission, seeking, among other things, temporary total disability benefits beginning on January 14, 2020. Middleton responded that Spry did not suffer a compensable injury and that his neck injury did not cause his spinal infarction.

At a hearing before a deputy commissioner, Spry described his workplace accident and injuries. According to Spry, his symptoms started after his neck popped and "progressively got worse and more noticeable" over time. Spry's wife also testified that his symptoms started after his neck popped.

---

[2] Middleton does not dispute that Spry suffered a spinal infarction or that it negatively affected his health and ability to work.

Spry's supervisor testified that Spry reported that he was "just a little sore" the day after his neck injury. The supervisor also claimed that inspecting a control box cover takes between 20 and 30 seconds and did not require a ladder if the control box could be seen from the ground. The supervisor acknowledged that various contractors had "pieces of their trade scattered around the building" at the time of Spry's accident.

The parties submitted records detailing Spry's medical treatment. Those records show that on January 15, 2020, Dr. Zachary Tan expressed concern that Spry had suffered a "spinal cord compression" and ordered an MRI of his cervical spine on a "highly urgent basis." After reviewing the MRI results, Dr. Tan referred Spry to Dr. Ugur Yilmaz, a neurologist. Dr. Yilmaz observed that Spry presented symptoms "suggestive of transverse myelitis or a demyelinating pathology such as multiple sclerosis" and instructed him to go to an emergency room for an "expedited workup."

Dr. Stephen Cox, a neurologist, later noted that Spry's symptoms "may be consistent with infarction of the cervical cord vs a demyelinating process." Dr. Cox "suspect[ed] a traumatic cause" if the infarction was vascular in nature but noted that Spry's history did "not correlate" with his suspicion because Spry's neck had popped weeks, rather than hours, before he experienced weakness in his arms. Dr. Ali Bydon also expressed uncertainty over whether Spry had suffered "an infarct versus transverse myelitis versus compressive myelopathy."

Dr. John Reavey-Cantwell, a cerebrovascular neurosurgeon and one of Spry's treating physicians, diagnosed Spry as having suffered a spinal infarction.[3] Dr. Reavey-Cantwell opined that it was "more likely than not" that Spry suffered a spinal infarction as a "direct result of his prolonged hyperextension and neck injury on December 16, 2019." According to Dr. Reavey-Cantwell, "the most reasonable explanation is that [Spry's] cervical stenosis, in

---

[3] Four other physicians agreed with Dr. Reavey-Cantwell's diagnosis.

conjunction with prolonged hyperextension of his neck on the job, resulted in an injury to his anterior spinal artery." Dr. Reavey-Cantwell added:

> It is well-known and well-established that blunt arterial injuries do not necessarily cause immediate symptoms. In fact, it is more common to see delayed symptoms from an arterial injury than a patient presenting with immediate symptoms. This fits entirely with Mr. Spry's time course of injury to presentation.

Dr. Yilmaz likewise attributed Spry's spinal infarction to his neck injury.

Dr. Donald LaMarche, Jr., reviewed Spry's medical records and agreed that he had suffered a spinal infarction. Dr. LaMarche also agreed that "a vascular injury (such as arterial dissection) could result in a delayed stroke" but opined that "a delay as long as four weeks from the time of injury would be quite unusual." Dr. LaMarche found "[n]o clear" cause for Spry's spinal infarction and disputed that "mere prolonged hyperextension of one's neck with [Spry's] degree of cervical stenosis would be enough to cause spinal cord swelling to the degree that would compromise the vascular flow to his spinal cord." Dr. William C. Andrews, Jr., similarly opined that "it is not clear to a reasonable degree of medical certainty that the infarct started at the time of the extension of [Spry's] neck."

Dr. Kevin M. McGrail also reviewed Spry's medical records and opined that "there is no evidence that [Spry] suffered a spinal cord infarction while working on December 16, 2019." According to Dr. McGrail, "[i]nfarction of the spinal cord is extremely unusual" and could be "idiopathic and spontaneous." Dr. McGrail acknowledged that it was possible that Spry's neck injury caused his spinal infarction but maintained that "such association of the two [events] would be extremely speculative."

Dr. Reavey-Cantwell responded to Dr. LaMarche and Dr. McGrail's concerns by letter. Dr. Reavey-Cantwell "strongly disagree[d]" with Dr. LaMarche's opinion that "a delay of four weeks from the time of injury to the onset of stroke would be unusual." Dr. Reavey-Cantwell

emphasized that he had seen "well over a thousand patients with blunt cerebral vascular injur[ies]" and that Spry's "time course of injury to presentation [was] well within the normal range." Dr. Reavey-Cantwell acknowledged that Spry's spinal infarction did not occur on December 16, 2019, but opined that it was likely that "the initial injury that set into motion the eventual spinal cord infarct did occur on that day." Dr. Reavey-Cantwell explained that "[p]atients who suffer traumatic blunt cerebrovascular injuries are normal until suddenly they are not" and that "[t]he change in condition is abrupt and can occur after a benign latency period."

After considering all the evidence, the deputy commissioner found that Spry's injuries did not arise out of his employment and denied his claim for benefits. The Commission reversed the deputy commissioner's decision because Spry's work "required him to extend his neck to look almost directly overhead" and his environment "necessitated this awkward, strained, and unusual position." The Commission remanded the case to the deputy commissioner "to address causation and any remaining issues or defenses."

The deputy commissioner determined that Spry's neck injury caused his spinal infarction.[4] The deputy commissioner specifically found Dr. Reavey-Cantwell and Dr. Yilmaz's opinions "more compelling" than those of Drs. LaMarche, Andrews, and McGrail. The Commission affirmed the deputy commissioner's decision noting that Dr. Reavey-Cantwell "persuasively disputed the contrary assessments proposed by independent medical examiners" and that Dr. Yilmaz also attributed Spry's spinal infarction to his neck injury.

---

[4] The deputy commissioner did not conduct a new evidentiary hearing on remand.

ANALYSIS

I. The Commission did not err in finding that Spry suffered a neck injury on December 16, 2019.

"The Commission's findings of fact 'are conclusive and binding on appeal'" if supported by credible evidence. *City of Charlottesville v. Sclafani*, 300 Va. 212, 222 (2021) (quoting *Carrington v. Aquatic Co.*, 297 Va. 520, 522 (2019)). "In determining whether credible evidence exists to support the [C]ommission's findings of fact, 'the appellate court does not retry the facts, reweigh . . . the evidence, or make its own determination of the credibility of the witnesses.'" *City of Newport News v. Kahikina*, 71 Va. App. 536, 545 (2020) (alterations in original) (quoting *Farmington Country Club, Inc. v. Marshall*, 47 Va. App. 15, 26-27 (2005)).

The Workers' Compensation Act requires a claimant to prove, by a preponderance of the evidence, that he or she suffered an injury by accident or occupational disease. *Sclafani*, 300 Va. at 221. "To demonstrate an injury by accident 'a claimant must prove that the *cause* of his injury was an *identifiable incident or sudden precipitating event* and that it resulted in an *obvious sudden mechanical or structural change in the body*.'" *Id.* (quoting *Morris v. Morris*, 238 Va. 578, 589 (1989)). "Our jurisprudence establishes that the requisite causative event must be more than a simple reference to a 'work activity;' it must be a specific occurrence that can be temporally fixed with reasonable accuracy." *Id.* (quoting *Morris*, 238 Va. at 588).

Middleton contends that the Commission erred by finding that Spry suffered a sudden mechanical or structural change to his neck on December 16, 2019. According to Middleton, Spry did not identify any specific injury on that date and returned to full-duty work before later suffering a spinal infarction. We disagree with that characterization of the evidence.

Spry's testimony establishes that his neck "popped" after he "crane[d]" his head to inspect a control box directly above him. He explained that he felt immediate, continuing symptoms after his neck popped, and his wife and various medical records corroborated his testimony. After treating

- 6 -

Spry and reviewing his medical records, Dr. Reavey-Cantwell and Dr. Yilmaz opined that Spry suffered a neck injury on December 16, 2019. In sum, there is ample credible evidence in the record supporting the Commission's finding that Spry injured himself while inspecting a control box by hyperextending his neck on December 16, 2019. That factual finding is therefore binding on this Court, and we will not disturb it on appeal. *Sclafani*, 300 Va. at 222-23.

> II. The Commission did not err in finding that Spry's neck injury arose out of his employment.

The Workers' Compensation Act "reflects a legislative 'quid pro quo' that gave workers the right to assert no-fault liability against their employers (a right that they had never possessed) and took from them the right to sue their employers in tort for negligence (a right that they had possessed under the common law)." *Lopez v. Intercept Youth Servs., Inc.*, 300 Va. 190, 196 (2021) (quoting *Jeffreys v. Uninsured Emp.'s Fund*, 297 Va. 82, 93 (2019)). "Code § 65.2-101's definition of a covered '[i]njury' polices the border between coverage and noncoverage." *Id.* (alteration in original). "Subject to various statutory qualifications, an injury covered by the Act 'means only injury by accident arising out of and in the course of the employment or occupational disease.'" *Id.* at 196-97 (quoting Code § 65.2-101). "The 'arising out of' and 'in the course of' elements of this definition 'are not synonymous,' and both must be satisfied for the Act to apply." *Id.* at 197 (quoting *R & T Invs., Ltd. v. Johns*, 228 Va. 249, 252 (1984)).

"Whether an injury arises out of the employment 'involves a mixed question of law and fact, which we review *de novo* on appeal.'" *Conner v. City of Danville*, 70 Va. App. 192, 200 (2019) (quoting *Blaustein v. Mitre Corp.*, 36 Va. App. 344, 348 (2001)). In conducting our review, "we are bound by the Commission's factual findings and reasonable inferences drawn from the evidence if they are supported by credible evidence in the record." *Id.* at 200-01. To determine whether an employee's injury arose out of his or her employment, "Virginia applies the 'actual risk' test, which 'requires that the employment subject the employee to the particular danger that brought about his

- 7 -

or her injury.'" *Id.* at 201 (quoting *Smithfield Packing Co. v. Carlton*, 29 Va. App. 176, 181 (1999)). "The actual risk test 'requires only that the employment expose the workman to the particular danger from which he was injured, notwithstanding the exposure of the public generally to like risks.'" *Id.* (quoting *Lucas v. Fed. Express Corp.*, 41 Va. App. 130, 134 (2003)). "The test is satisfied 'only . . . "if there is a causal connection between the claimant's injury and the conditions under which the employer requires the work to be performed."'" *Id.* (alteration in original) (quoting *O'Donoghue v. United Cont'l Holding, Inc.*, 70 Va. App. 95, 104 (2019)).

Middleton contends that Spry's neck injury did not arise out of his employment, but rather "the simple act of looking up." Middleton emphasizes that Spry felt his neck pop after looking up, that his view was unobstructed, and that he did not testify that he was carrying anything that would have affected his actions. Middleton's view of the evidence ignores the full context of Spry's neck injury.

Spry injured his neck while inspecting a control box through a ceiling grid. Spry's and his supervisor's testimony established that various tools and materials were "scattered around the building." As a result, Spry could not place a ladder beneath the ceiling grid to inspect the control box. Moreover, Spry's supervisor testified that a ladder was unnecessary if the control box could be seen from the ground. Thus, credible evidence supports the Commission's finding that Spry's work "required him to extend his neck to look almost directly overhead" and that his environment "necessitated this awkward, strained, and unusual position." Accordingly, we affirm the Commission's determination that Spry suffered a compensable neck injury that arose out of his employment.

III. The Commission did not err in finding that Spry's neck injury caused his spinal infarction.

"The [C]ommission's determination regarding causation is a finding of fact." *Kahikina*, 71 Va. App. at 545 (alteration in original) (quoting *Marshall*, 47 Va. App. at 26). "Decisions of the

[C]ommission as to questions of fact are conclusive and binding upon this Court if supported by credible evidence." *Id.* (alteration in original) (quoting *United Airlines, Inc. v. Hayes*, 58 Va. App. 220, 238 (2011)). "In determining whether credible evidence exists to support the [C]ommission's findings of fact, 'the appellate court does not retry the facts, reweigh . . . the evidence, or make its own determination of the credibility of the witnesses.'" *Id.* (alterations in original) (quoting *Marshall*, 47 Va. App. at 26-27).

Middleton contends that the Commission erred by finding that Spry's neck injury caused his spinal infarction. Middleton points out that several doctors, including Dr. LaMarche, could not attribute Spry's spinal infarction to his neck injury. Middleton further emphasizes that some doctors suggested other potential causes for Spry's symptoms. Middleton argues that the evidence in this case "simply amounts to a chain of events that may have caused the ultimate injury" and that Dr. Reavey-Cantwell and Dr. Yilmaz failed to consider alternative explanations for Spry's symptoms.

"A question raised by conflicting medical opinions is a question of fact." *Island Creek Coal Co. v. Honaker*, 9 Va. App. 336, 340 (1990). Dr. Reavey-Cantwell and Dr. Yilmaz opined that Spry's neck injury caused his spinal infarction. Drs. LaMarche, Andrews, and McGrail did agree that Spry's neck injury was a potential cause of his spinal infarction. When responding to Dr. LaMarche and Dr. McGrail's concerns, Dr. Reavey-Cantwell emphasized his experience in treating such injuries and that the symptoms of Spry's spinal infarction were consistent with his neck injury. Moreover, the record supports that Spry's condition progressively deteriorated after suffering his neck injury until he was later diagnosed with having suffered a spinal infarction.

After considering the evidence, the Commission found Dr. Reavey-Cantwell and Dr. Yilmaz's opinions more persuasive than those of Drs. LaMarche, McGrail, and Andrews.

Because the Commission's finding is supported by credible evidence, we will not disturb it on appeal. *Kahikina*, 71 Va. App. at 545.

CONCLUSION

For these reasons, we affirm the Commission's decision.

*Affirmed.*